IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| KYLE LAWSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 14-0622-CV-W-ODS |
| | ) | |
| ROBERT T. KELLY, in his official | ) | |
| Capacity as Director of the Jackson | ) | |
| County Department of Recorder of | ) | |
| Deeds, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| STATE OF MISSOURI, | ) | |
| | ) | |
| Intervenor. | ) | |

<u>ORDER AND OPINION (1) GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS, (2) GRANTING
IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT, (3) GRANTING IN PART AND DENYING IN PART PLAINTIFFS'
MOTION FOR PERMANENT INJUNCTION, AND (4) STAYING EFFECT OF
JUDGMENT PENDING COMPLETION OF APPEALS</u>

Plaintiffs seek to vindicate their fundamental right to marry, irrespective of the gender of the person they wish to wed. They have sued Robert Kelly, in his official capacity as Director of the Jackson County Department of Recorder of Deeds, seeking to enjoin enforcement of state law – including provisions of the Missouri Constitution and the Revised Missouri Statutes – that would preclude Defendant from issuing the marriage license they seek.

The State of Missouri ("the State") intervened as of right pursuant to section 527.110 of the Revised Missouri Statutes in order to defend the constitutionality of these provisions. The State then removed the case to federal court and Kelly has

taken no action other than to consent to the removal.[1]  Now pending are three motions, all of which are ready for ruling:

1. The State's Motion for Judgment on the Pleadings,
2. Plaintiffs' Motion for Summary Judgment, and
3. Plaintiffs' Motion for Permanent Injunction.

## I.  BACKGROUND

Plaintiffs Kyle Lawson and Even Dahlgren, both of whom are male, desire to be married.  Plaintiffs Angela Curtis and Shannon McGinty, both of who are female, desire to be married.  Both couples comply with all marriage requirements imposed by Missouri law save one: they seek to marry a person of the same gender.  In June 2014, Lawson and Dahlgren went to the Jackson County Recorder of Deeds to obtain a marriage license; their application was rejected.  Separately (but also in June 2014), Curtis and McGinty went to the Jackson County Recorder of Deeds to obtain a marriage license; their application was also rejected.

In 1996, the Missouri General Assembly passed (and the Missouri Governor signed) a law declaring that "[i]t is the public policy of this state to recognize marriage only between a man and a woman" and further directing that no Recorder of Deeds "shall issue a marriage license, except to a man and a woman."  Mo. Rev. Stat. § 451.022.  In August 2004, the citizens of Missouri approved an Amendment to the Missouri Constitution declaring "[t]hat to be valid and recognized in this state, a marriage shall exist only between a man and a woman."  Mo. Const. Art. I, § 33.

These statutory and constitutional provisions provide the basis for Kelly's refusal to issue Plaintiffs the marriage licenses they sought.  Plaintiffs present three claims.  Count I asserts these provisions deprive Plaintiffs of the fundamental right to

---

[1] Plaintiffs filed a Motion to Remand, then sought and obtained leave to withdraw that motion.  The Motion to Remand did not challenge the Court's subject matter jurisdiction; instead, it argued there was a defect in the removal process. There is no question the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and defects in the removal process can be waived, e.g., Nolan v. Prime Tanning Co., 871 F.2d 76, 78 (8th Cir. 1989), so there is no reason for the Court to delve into the matter further.

marry in violation of the Due Process Clause. Count II alleges these provisions discriminate based on sexual orientation in violation of the Equal Protection Clause. Finally, Count III alleges these provisions discriminate based on gender in violation of the Equal Protection Clause.

## II.  DISCUSSION

### A.  Defendant's Motion for Judgment on the Pleadings

The Court first considers the State's Motion for Judgment on the Pleadings. The State contends the Supreme Court and the Eighth Circuit Court of Appeals have both ruled that provisions limiting marriage to members of opposite genders are constitutional. This Court is bound by decisions of the Supreme Court and the Eighth Circuit, so if the State is correct the Court would be obligated to rule in the State's favor. However, the Court disagrees with the State's interpretation of precedent.

#### *1.  The Supreme Court's Precedent*

##### **(a).  United States v. Windsor**

The State finds support in two prior Supreme Court decisions. The first is *United States v. Windsor* – which, interestingly, Plaintiffs also cite as support. The Court disagrees with both sides and concludes *Windsor* does not aid either of them. The Court will discuss *Windsor* once now and explain why it is inapplicable to the issues at hand to avoid the need to discuss the matter twice.

The State is correct when it describes *Windsor* as discussing the states' historic role in regulating marriage. 133 S. Ct. 2675, 2689-91 (2013). However, the Supreme Court did so only to demonstrate the curiosity of the federal government's endeavor to regulate the matter through passage of the Defense of Marriage Act ("DOMA"). As the majority explained, "[i]n order to assess the validity of [DOMA's]

3

intervention, it is necessary to discuss the extent of the state power and authority over marriage as a matter of history and tradition." Id. at 2691. Given this historical state prerogative and responsibility, the Court found DOMA's "unusual" attempt to draw distinctions between various types of valid marriages violated the Fifth Amendment. Id. at 2681, 2693.[2]

Critically for present purposes, *Windsor* did not purport to establish what kinds of marriages *states* are obligated to regard as proper; it simply accepted the existence of a marriage deemed lawful by the State of New York and held the federal government could not deem that marriage a nullity. The following passages from the *Windsor* majority's penultimate paragraph make the point:

> The class to which DOMA directs its restrictions and restraints are those persons who are joined *in same-sex marriages made lawful by the State. DOMA singles out a class of persons deemed by a State entitled to recognition and protection to enhance their own liberty.* It imposes a disability on the class by refusing to acknowledge a status the State finds to be dignified and proper. . . . The federal statute is invalid, for no legitimate purpose overcomes the purpose and effect to disparage and to injure those whom the State, by its marriage laws, sought to protect in personhood and dignity. By seeking to displace this protection and treating those persons as living in marriages less respected than others, the federal statute is in violation of the Fifth Amendment.

133 S. Ct. at 2695-96 (emphasis supplied). The very next sentence cautions against interpreting the opinion as imposing requirements on the states when it declares "[t]his opinion and its holding are confined to those lawful marriages." Id. at 2696.

The State is wrong when it contends *Windsor* holds that state statutes forbidding same-sex marriage are constitutional. Plaintiffs are wrong when they contend *Windsor* holds states are constitutionally required to allow same-sex marriages. Thus, both parties are incorrect when they contend *Windsor* dictates a favorable outcome for their positions.

---

[2]One might think *Windsor* was a case about federalism. However, the majority said "it is unnecessary to decide whether this federal intrusion on state power is a violation of the Constitution because it disrupts the federal balance," 133 S. Ct. at 2690, and couched the violation in terms of the Fifth Amendment. Therefore, according to the majority, *Windsor* is not a case about federalism.

4

### (b). Baker v. Nelson

The second Supreme Court decision arises from *Baker v. Nelson,* a 1971 decision of the Minnesota Supreme Court.  In *Baker*, the plaintiffs contended Minnesota's statutes did not require couples wishing to marry be of opposite genders.  Alternatively, they argued that if the statutes were interpreted to preclude same-sex marriage, the statutes violated the United States Constitution.  The Minnesota Supreme Court first interpreted its statutes to require that marriage be between a man and a woman.  The court then addressed the constitutional arguments and held that such an interpretation did not unconstitutionally deny the plaintiffs the fundamental right to marry, deprive the plaintiffs of liberty or property without due process, or violate the plaintiffs' Equal Protection rights.  191 N.W.2d 185 (Minn. 1971).

At that time, Supreme Court review of constitutional challenges was different than it is today.  Now, of course, the Supreme Court has discretion to grant certiorari to review such decisions.  However, in 1971, 28 U.S.C. § 1257 permitted an appeal as of right to the Supreme Court from the final decision of a state court "where is drawn in question the validity of a statute of any state on the ground of its being repugnant to the Constitution . . . ."  This does not mean the Supreme Court issued rulings in every such appeal; frequently, it disposed of the case summarily.  This is what the Court did in *Baker*: in a one-sentence order, the Court ruled "[t]he appeal is dismissed for want of a substantial federal question."  Baker v. Nelson, 409 U.S. 810 (1972).  The State argues the Supreme Court's decision is a substantive and binding determination that there is no constitutional concern – much less an impingement of a constitutional right – when a state forbids same-sex marriage.

A summary disposition by the Supreme Court is a decision on the merits and has precedential value.  E.g., Hicks v. Miranda, 422 U.S. 332, 344-45 (1975).[3]

---

[3]This is in contrast to the denial of certiorari.  The Supreme Court's decision to deny certiorari has no precedential value.  E.g., Teague v. Lane, 489 U.S. 288, 296 (1989) (citing United States v. Carver, 260 U.S. 482, 490 (1923)).  Accordingly,

5

However, the precedential value is not as great as a full-fledged opinion because "a summary affirmance is an affirmance of the judgment only, [so] the rationale of the affirmance may not be gleaned solely from the opinion below." Mandel v. Bradley, 432 U.S. 173, 176 (1977). All that is affirmed is the judgment, and not necessarily the reasoning employed by the lower court. Id. Thus, "summary affirmances obviously are of precedential value [but] [e]qually obviously, they are not of the same precedential value as would be an opinion of this Court treating the question on the merits." Edelman v. Jordan, 415 U.S. 651, 671 (1974). An outright reversal or explicit repudiation is not necessary to deprive a summary disposition of its precedential value.[4] "[I]nferior federal courts had best adhere to the view that if the Court has branded a question as unsubstantial, it remains so except when *doctrinal developments* indicate otherwise." Hicks, 422 U.S. at 344 (quotation omitted; emphasis supplied).

    The Court concludes doctrinal developments indicate the Supreme Court's summary ruling is not reliable or binding. Since its summary disposition in Baker, the Supreme Court has issued additional decisions discussing the right to marry. E.g., Turner v. Safley, 482 U.S. 78 (1987); Zablocki v. Redhail, 434 U.S. 374 (1978). The Court has also issued decisions addressing laws that draw distinctions between homosexual and heterosexual conduct or homosexuals and heterosexuals as a class. E.g., Lawrence v. Texas, 123 S. Ct. 2472 (2003); Romer v. Evans, 517 U.S. 620 (1996). As the Second Circuit observed in *Windsor*, "[w]hen *Baker* was decided in 1971, 'intermediate scrutiny' was not yet in the Court's vernacular. Classifications based on illegitimacy and sex were not yet deemed quasi-suspect." Windsor v. United States, 699 F.3d 169, 179 (2d Cir. 2012), aff'd, 133 S. Ct. 2675 (2014).

---

the Court rejects Plaintiffs' entreaties to divine some meaning from the Supreme Court's denial of certiorari in several appellate decisions upholding the rights of homosexuals to marry.

    [4]This rule may be a product of the large number of cases disposed of summarily, and the great difficulty involved in expecting the Supreme Court to list every summary disposition that might be impacted by a written opinion. Cf. Port Auth. Bondholders Protective Comm. v. Port of New York Auth., 387 F.2d 259, 262 n.3 (2d Cir. 1967) (cited with approval in *Hicks*).

6

Given that the Second Circuit concluded *Baker* was not binding, and that the Second Circuit was later affirmed in in *Windsor*, "[t]he Supreme Court's willingness to decide *Windsor* without mentioning *Baker* speaks volumes regarding whether *Baker* remains good law." Bostic v. Schaefer, 760 F.3d 352, 374 (4th Cir. 2014), cert. denied, 2014 WL 3924685 (U.S. 2014). The undersigned joins those courts that have similarly determined that doctrinal developments have superseded *Baker* and that *Baker* is not binding. E.g., Latta v. Otter, 2014 WL 4977682 at *3 (9th Cir. Oct. 7, 2014); Baskin v. Bogan, 766 F.3d 648, 659-60 (7th Cir. 2014), cert. denied, 2014 WL 4425162 (U.S. 2014); Bostic, 760 F.3d at 374-75; Kitchen v. Herbert, 755 F.3d 1193, 1205-06 (10th Cir.), cert. denied, 2014 WL 3841263 (U.S. 2014); but see Massachusetts v. United States Dep't of Health & Human Servs., 682 F.3d 1, 8 (1st Cir. 2012), cert. denied, 133 S. Ct. 2887 (2013) ("*Baker* does not resolve our own case but it does limit the arguments to ones that do not presume or rest on a constitutional right to same-sex marriage.").[5]

---

[5]The plaintiffs in *Baker* were Richard Baker and the man he sought to marry, James McConnell. McConnell filed subsequent lawsuits in federal court; neither party mentions these suits or discusses their impact on this case, but the Court must do so because the appeals were decided by the Eighth Circuit.

Shortly after *Baker* was decided, McConnell sought additional VA benefits on the theory that Baker was his dependent spouse. The effort failed, and in 1976 the Eighth Circuit affirmed the district court's denial of relief. McConnell v. Nooner, 547 F.2d 54 (1976) (per curiam) (hereafter "McConnell I"). The Eighth Circuit noted that while *Baker* was pending Baker and McConnell had actually obtained a marriage license and participated in a wedding ceremony. The Court of Appeals relied on *Baker* to hold that the marriage was invalid under state law – an issue over which the Minnesota Supreme Court was the ultimate arbiter. The Court of Appeals also held "the Supreme Court's dismissal of the appeal for want of a substantial federal question constitutes an adjudication of the merits which is binding on the lower federal courts. . . . They, therefore, are collaterally estopped from relitigating these issues once more." Id. at 56. This decision from 1976 does not mean that *Baker* is still binding for two reasons. First, it is not clear what constitutional issues were raised. Obviously, the Supreme Court's decision could only be binding for the issues actually raised in *Baker*, and the Eighth Circuit's decision could address *Baker*'s viability only for issues raised in McConnell I. Second, and more importantly *McConnell I* was decided before most of the aforementioned doctrinal developments occurred. Intermediate scrutiny for gender based classifications was applied for the first time a mere one day before *McConnell I* when the Supreme Court decided

7

## 2. The Eighth Circuit's Precedent

The State also argues the Eighth Circuit conclusively rejected Plaintiff's claims in 2006 when it decided *Citizens for Equal Protection v. Bruning*. The Court disagrees because the issue in *Bruning* did not involve the constitutionality of a state's prohibition of same-sex marriages.

*Bruning* involved an amendment to the Nebraska Constitution that declared that only marriages between a man and woman would be recognized in that state and that same-sex marriages would not be recognized. While this makes it appear that *Bruning* involves the same issues as this case, this conclusion is false: the plaintiffs in *Bruning* attacked the constitutional amendment by arguing that it deprived them of

---

*Craig v. Boren*, 429 U.S. 190 (1976), and the rest of the developments in that area – and the other cases cited in the text – occurred thereafter.

    Decades later, McConnell sought an income tax refund, contending he and Baker were lawfully married and thus entitled to file as a married couple. The district court denied McConnell's claim and the Eighth Circuit affirmed in an unpublished opinion. The Court of Appeals again referenced *Baker*, observing that "[t]he United States Supreme Court upheld that decision on appeal by dismissing the appeal for want of a substantial federal question" and citing *Hicks* for the proposition that "dismissal of appeal for want of substantial federal question constitutes adjudication of merits which is binding on lower federal courts." McConnell v. United States, 188 Fed. Appx. 540, 542 (8th Cir. 2006) (per curiam) (unpublished) (hereafter "McConnell II"). However, the Eighth Circuit's opinion does not describe any constitutional issues raised in the case. Neither does the district court's opinion that formed the basis of the appeal. McConnell v. United States, 2005 WL 19458 (D. Minn. 2005). The Court has examined the Appellant's Brief, and it similarly does not specify the nature of any constitutional attack on Minnesota's prohibition on same-sex marriage. To the contrary: McConnell argued that he was not seeking a right to *become* married because he and Baker were *already* married: he theorized that because the couple had obtained a marriage license and participated in a ceremony, the subsequent "revocation" of that marriage constituted a violation of their Due Process rights. Appellant's Brief at 25-26. This is the only time the Constitution is mentioned in connection with the issue of marriage. The Court concludes *McConnell II* does not require the Court to apply *Baker* for two reasons. First, *McConnell II* is an unpublished disposition, and unpublished opinions are binding in limited circumstances, none of which appear present in this situation. Second, the plaintiffs in *McConnell II* asserted a completely different claim and did not raise the constitutional issues raised in this case. Thus, to whatever extent *McConnell II* dictates that *Baker* is still binding, it cannot be understood as confirming *Baker* applies to the claims at issue here.

8

access to the political process. The Eighth Circuit characterized the plaintiffs' claims as follows:

> *Appellees do not assert a right to marriage or same-sex unions.* Rather, they seek a level playing field, an equal opportunity to convince the people's elected representatives that same-sex relationships deserve legal protection. The argument turns on the fact that § 29 is an amendment to the Nebraska Constitution. Unlike state-wide legislation restricting marriage to a man and a woman, a constitutional amendment deprives gays and lesbians of "equal footing in the political arena" because state and local government officials now lack the power to address issues of importance to this minority.

Bruning, 455 F.3d 859, 865 (8th Cir. 2006) (quotations omitted; emphasis supplied). The plaintiffs did not assert a right to same-sax marriage, so nothing in *Bruning* directly disposes of whether such a right exists.

In rejecting the plaintiffs' challenges, the Eighth Circuit first observed that many constitutional provisions impair the ability to participate in the political process, but such impairments are not automatically unconstitutional. Id. at 865-66 & n.2. The plaintiffs in *Bruning* argued for a higher degree of scrutiny because homosexuals are a suspect classification, but the Eighth Circuit rejected this argument. Id. at 866-67. As the Eighth Circuit explained, "[i]f sexual orientation, like race, were a 'suspect classification' for purposes of the Equal Protection Clause, then [the plaintiffs'] focus on the political burden erected by a constitutional amendment would find support" in several Supreme Court cases. Id. at 866. The Eighth Circuit then applied rational basis review and upheld the amendment to the Nebraska Constitution. Id. at 867-68.

Critically for present purposes, the *Bruning* plaintiffs did not argue the classification created by the amendment impaired a fundamental right – so the Eighth Circuit's ruling cannot be construed as passing on this issue. Similarly, the *Bruning* plaintiffs did not argue the amendment drew distinctions based on gender – so once again, the Eighth Circuit's ruling cannot be construed as passing on this issue. Indeed, *Bruning* makes no mention of these arguments – which is unsurprising, given that the plaintiffs were not even seeking to vindicate their right to

9

marry.  *Bruning* does not control because it does not address the claims raised in this case.

However, there is one aspect of *Bruning* that relates to the issues in this case. As noted above, *Bruning* holds that sexual orientation is not a suspect class and that classifications based on sexual orientation are not subject to heightened review of any kind.  This directly impacts Count II, and requires the Court to uphold section 451.022 and Article I, section 33 if they are rationally related to a legitimate governmental interest, keeping in mind that such provisions enjoy a strong presumption of validity.  In applying this standard, the *Bruning* court clearly expressed its belief that laws prohibiting same-sex marriage would pass rational basis review.  455 F.3d at 867-68.  On this basis, the Court grants the State judgment on the pleadings with respect to Count II.

But to reiterate – *Bruning* did not consider whether laws prohibiting same-sex marriage would pass intermediate or strict scrutiny.  More importantly, *Bruning* did not consider – *because it was not asked to consider* – whether there is a constitutional right to same-sex marriage, either because laws forbidding it burden a fundamental right or draw impermissible distinctions based on gender.  Therefore, *Bruning* does not control with respect to Count I or Count III.

### B.  Plaintiffs' Motion for Summary Judgment

Plaintiffs seek summary judgment on each of the three counts they have advanced.  The Court already has granted Defendant judgment on the pleadings with respect to Count II, and further discussion of that count is unnecessary. Plaintiffs' motion is denied to that extent, but it is granted with respect to Counts I and III.

As a general matter, the State emphasizes its prerogative to regulate marriage. The extent of this power will be discussed in greater detail below.  However, while many cases have confirmed the states' power to regulate marriage, this power is not a talisman that automatically wards off all constitutional challenges.  Numerous cases confirm that the states' power in this arena – like the states' power in all

10

arenas – is subject to constraints imposed by the Constitution.  Thus, it is no answer to the issues at hand to observe merely that the State has the power to impose regulations on the institution of marriage; the question is whether the regulations at issue comport with the Constitution.

### 1.  Due Process: Abridgment of a Fundamental Right

In 1967, the Supreme Court considered "a constitutional question never addressed by this Court: whether a statutory scheme . . . to prevent marriages between persons solely on the basis of racial classifications violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment."  Loving v. Virginia, 388 U.S. 1, 2 (1967).  The Court concluded the statute violated both clauses.  With respect to the Due Process Clause, the Court wrote: "These statutes also deprive the Lovings of liberty without due process of law in violation of the Due Process Clause of the Fourteenth Amendment.  The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men."  388 U.S. at 12.  The Court concluded this "fundamental freedom" could not be denied based on racial classifications.  Despite this apparent merging of the Due Process and Equal Protection analyses, the Court has since adhered to the view that marriage is a fundamental right entitled to protection under the Due Process Clause.  "Although *Loving* arose in the context of racial discrimination, prior and subsequent decisions of [the Supreme] Court confirm that the right to marry is of fundamental importance for all individuals."  Zablocki v. Redhail, 434 U.S. 374, 384 (1978); see also Turner v. Safley, 482 U.S. 78, 94-95 (1987) (noting the petitioners "concede[d] that the decision to marry is a fundamental right" under Supreme Court precedent).

The existence of a Due Process right to marry – separate and apart from any Equal Protection concerns – is further confirmed by *Zablocki* and *Turner* because neither of those cases involved a suspect or quasi-suspect class.  *Zablocki* considered a state statute that prohibited non-custodial parents subject to a child support order from marrying absent judicial approval.  While the statute drew a

11

distinction between those who were subject to child support orders and those who were not, it was not this classification that warranted higher scrutiny. Instead, it was the understanding "that the right to marry is part of the fundamental 'right of privacy' implicit in the Fourteenth Amendment's Due Process Clause." 434 U.S. at 384. The Court noted "that the decision to marry has been placed on the same level of importance as decisions relating to procreation, childbirth, child rearing, and family relationships." Id. at 386. *Turner* involved a regulation that required a prison warden's approval to marry. The specter of requiring a state official's approval of person's worthiness for marriage caused the Supreme Court to brand the regulation as "unreasonable," even in a prison setting.

The difficulty is that the Court has not clearly enunciated the Due Process contours of the right to marry. Indeed, it has refrained from doing so. The *Zablocki* Court admitted as much when it held that the right to marry – unlike other rights regarded as "fundamental" – is susceptible to significant state regulation. "By reaffirming the fundamental character of the right to marry, we do not mean to suggest that every state regulation which relates in any way to the incidents of or prerequisites for marriage must be subjected to rigorous scrutiny. To the contrary, reasonable regulations *that do not significantly interfere with decisions to enter into the marital relationship* may legitimately be imposed." Id. at 386 (emphasis supplied). The difficulty then becomes: what kinds of regulations "may legitimately be imposed" and what kinds "must be subjected to rigorous scrutiny?"[6]

Regulations related to the effects or consequences of the marital state are not subject to exacting scrutiny. For instance, in *Califano v. Jobst*, 434 U.S. 47 (1977), the Supreme Court upheld a provision terminating Social Security benefits for a disabled dependent child upon the child's marriage. Anti-nepotism policies that preclude the hiring of a husband and a wife are constitutional. E.g., Parsons v. Del

---

[6]This difficulty was raised by Justice Powell in his concurrence, where he noted that the majority opinion "does not present, however, any principled means for distinguishing between the two types of regulations. Since state regulations in this area typically take the form of prerequisite or barrier to marriage . . . the degree of 'direct' interference with the decision to marry . . . is unlikely to provide either guidance for state legislatures or a basis for judicial oversight." Zablocki, 434 U.S. at 396-97 (Powell, J., concurring).

12

Norte County, 728 F.2d 1234 (9th Cir. 1984).  The critical difference between these provisions and the one at issue in Zablocki is that the latter "interfere[d] directly and substantially with the right to marry," Zablocki, 386 U.S. at 387, while the first two regulations do not restrict a person's decision to marry or who that person marries.

It also appears accepted that the State may restrict (or even prohibit) marriage for reasons related to public health or to insure the participants are of an appropriate age to consent to a marital relationship.  In concurring with the majority in Zablocki, Justice Stewart opined that a state could absolutely forbid marriage in certain circumstances: "for example, a State may legitimately say that no one can marry his or her sibling, that no one can marry who is not at least 14 years old, that no one can marry without first passing an examination for venereal disease, or that no one can marry who has a living husband or wife."  Zablocki, 434 U.S. at 392 (Stewart, J., concurring); see also Bruning, 455 F.3d at 867.  However, while Justice Stewart was certain such regulations were permissible, "just as surely, in regulating the intimate human relationship of marriage, there is a limit beyond which a State may not constitutionally go."  Zablocki, 434 U.S. at 392 (Stewart, J., concurring).  The Court thus accepts that these are additional regulations a state may constitutionally impose – but that this justification does not extend to every restriction a state might want to impose on a citizen's right to decide whether – and whom – to marry.

The question then becomes: what is the State's justification for requiring those who are to be married to be of opposite genders?  Such a restriction is not a mere consequence of being married: it is a prohibition on marriage, and thus cannot be supported by cases like *Califano* and *Parsons*.  The State does not suggest the prohibition is designed to promote public health or insure the consent or maturity of the participants, and any such suggestion would be unavailing in any event.  These provisions flatly prohibit consenting adults from getting married for reasons unrelated to health or any other reason espoused in Justice Stewart's concurrence.  This is the type of restriction condemned by Zablocki because it significantly interferes with decisions to enter into the marital relationship.  The prohibition must be examined with strict scrutiny, and viewed in that light the restriction fails to satisfy the Due Process Clause's dictates.

13

The State suggests the restriction is rationally related to its interest in promoting consistency, uniformity and predictability.[7] This is a circular argument that probably would not satisfy rational basis review and that certainly fails the level of review required in this case. The State essentially argues the restriction satisfies governmental interests because it creates a rule that can be applied by the recorders of deeds and others – but then, *all* restrictions create rules, so by the State's logic any restriction is automatically constitutional simply because it creates rules that can be followed. As stated, this is circular: the rule is alleged to be constitutional because it can be followed. But then, a rule restricting marriage to those with one-syllable names promotes consistency, uniformity and predictability. A rule restricting marriage to people within a specified age difference promotes consistency, uniformity and predictability. Neither of these rules would be constitutional – the state's ability to interfere with the personal decision as to who can and cannot get married is not so far-reaching. Merely prescribing a "followable" rule does not demonstrate the rule's constitutionality.

The Court is left, then, with no real reason for the State's decision to dictate that people of the same gender cannot be married. The State's power to dictate who can and cannot be married is limited to the promotion of certain interests, none of which are served by the limitation advanced. Of course, the question is not whether the restriction satisfies the rational basis test; the Court has held the restriction burdens a fundamental right so it is subject to strict scrutiny. This requires the State to demonstrate the restriction is narrowly tailored to advance a compelling state interest – but the only interest advances is not compelling and the restriction is not

---

[7]In a footnote the State "reiterate[s] that there are many diverse motives and interests that have been advanced and analyzed by [other] courts and may certainly be applicable in this case." Defendant's Suggestions in Opposition (Doc. # 43) at 10 n.1. The State argues Plaintiffs bear the burden of disproving all of these unnamed motives and interests to demonstrate the restrictions fail under rational basis review. There is no need to delve into this matter because the Court has concluded a higher degree of scrutiny is required. Regardless, the better course would have been for the State to advance its justifications.

14

narrowly tailored to that interest. Accordingly, the Court holds the prohibition on same-sex marriage violates the Fourteenth Amendment's Due Process Clause.

### 2. Equal Protection: Classification Based on Gender

The restriction on same-sex marriage is a classification based on gender. The State's "permission to marry" depends on the gender of the would-be participants. The State would permit Jack and Jill to be married but not Jack and John. Why? Because in the latter example, the person Jack wishes to marry is male. The State's permission to marry depends on the genders of the participants, so the restriction is a gender-based classification.[8]

Restrictions based on gender are subject to intermediate scrutiny. The State bears the burden of demonstrating that the classification serves important governmental objectives and that the use of a gender-based classification is substantially related to the achievement of that objective. E.g., United States v. Virginia, 518 U.S. 515, 532-33 (1996). The State has not carried its burden. Its sole justification for the restriction is the need to create rules that are predictable, consistent, and can be uniformly applied. Assuming this is a valid justification for a restriction, there is no suggestion as to why the gender-based classification is substantially related to that objective. A rule that ignores gender would be just as related to that objective and be just as easy to apply (and arguably would impose less of a burden on the Recorders of Deeds because they would not have to conduct any gender-based inquiry whatsoever). Regardless, administrative convenience is not a valid reason to differentiate between men and women.

---

[8]The State did not present any arguments specific to Count III, and thus did not make any argument suggesting the restriction is not a gender-based classification. However, the State conceded that intermediate scrutiny applies to such classifications. Defendant's Suggestions in Support of Motion for Judgment on the Pleadings (Doc. # 8) at 7.

15

### C. Plaintiffs' Motion for Permanent Injunction

In anticipation of winning on one or more counts on summary judgment, Plaintiffs filed a separate Motion for Permanent Injunction. The motion seeks an injunction prohibiting the "State of Missouri, including its political subdivisions, their officers, agents, servants, employees, attorneys, and all persons acting in concert with them, or in connection with them, from enforcing § 451.022 RSMo; Mo. Const. art. I, § 33; and any other provision of Missouri or statutory or common law barring same sex couples from marrying." Suggestions in Support (Doc. # 29) at 2. The problem is: the only defendant in this case is Robert T. Kelly in his official capacity as Director of the Jackson County Department of Recorder of Deeds. Plaintiffs offer no binding authority explaining why a broader injunction is permissible, and the Court concludes it cannot enjoin people and officers who are not defendants in this action.

In reaching its decision in this case the Court has necessarily declared the State's prohibition on same-sex marriages violates the Constitution. However, the only other relief that can spring from that declaration is an injunction prohibiting the sole Defendant – Kelly, acting in his official capacity – from enforcing the prohibition. In this regard, the Court agrees that Plaintiffs will suffer irreparable harm from being deprived of the opportunity to marry. The balance of hardships and the public interest favor enjoining Defendant Kelly because this is the only way to vindicate Plaintiffs' constitutional rights. There is no hardship in requiring that public officials adhere to the Constitution, and the public interest is always served when the Constitution is obeyed.

### D.

The Court does not take lightly a request to declare that a state law is unconstitutional. Statutes are passed by the duly elected representatives of the people. Article I, section 33 constitutes the direct expression of the people's will. It

16

is not on a whim that the Court supplants the will of the voters or the decisions of the legislature.

But it should not be forgotten that the Constitution is also an expression of the people's will. Indeed, it is the paramount expression of the people's will; it cannot easily be cast aside or circumvented by a vote of the citizens of a single state. Just as Missouri citizens cannot abridge the First Amendment by amending the Missouri Constitution, they cannot abridge the Fourteenth Amendment in that manner. As Alexander Hamilton explained in describing the Constitution's preeminent place in the rule of law:

> There is no position which depends on clearer principles than that every act of a delegated authority, contrary to the tenor of the commission under which it is exercised, is void. No legislative act, therefore, contrary to the Constitution, can be valid. To deny this would be to affirm that the deputy is greater than his principal; that the servant is above his master; that the representatives of the people are superior to the people themselves; that men acting by virtue of powers may do not only what their powers do not authorize, but what they forbid.

The Federalist No. 78 (Alexander Hamilton). Later, Hamilton described the importance of the judiciary's role in insuring the Constitution's role as the preeminent law of the Nation, stating the judiciary's role includes:

> guard[ing] the Constitution and the rights of individuals from the effects of those ill humors which the arts of designing men, or the influence of particular conjunctures, sometimes disseminate among the people themselves, and which, though they speedily give place to better information, and more deliberate reflection, have a tendency, in the meantime, to occasion dangerous innovations in the government, and serious oppressions of the minor party in the community.

Id.

It is the Court's view that the provisions of this statute and this section of the Missouri Constitution contravene the United States Constitution. Having reached that conclusion, it is the Court's obligation to give effect and force to the United States Constitution.

## III. CONCLUSION

For these reasons, the Court

1. Grants the State's Motion for Judgment on the Pleadings with respect to Count II, but denies it in all other respects,
2. Grants Plaintiffs' Motion for Summary Judgment with respect to Counts I and III, but denies it with respect to Count II,
3. Declares, pursuant to 28 U.S.C. § 2201, that section 451.022 of the Revised Missouri Statutes and Article I, section 33 of the Missouri Constitution, and any other provision of state law that precludes people from marrying solely because they are of the same gender[9] violates the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment, and
4. Permanently enjoins Robert T. Kelly, in his official capacity as Director of the Jackson County Department of Recorder of Deeds, from declining to issue a marriage license based on the genders of the applicants or otherwise enforcing the prohibition on issuing a marriage license except to a man and a woman.

The effects of the judgment will be stayed until the judgment is final.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
DATE: November 7, 2014            UNITED STATES DISTRICT COURT

---

[9] There are other provisions in the statute, notably provisions related to the recognition of marriages performed elsewhere. Article 1, section 33, also has implications for the recognition of marriages performed in other states. The Court's Order and Opinion does not address this aspect of Missouri's laws because it is beyond the purview of the claims presented.